Case number 19-1153 et al. Tuscola Area Airport Authority et al. Petitioners v. Stephen Dickson. Mr. Armstrong for the petitioners, Ms. Kirsvang for the respondents. Good morning, your honors. May I proceed? Yes, please. My name is Alan Armstrong. I represent the Tuscola Area Airport Authority and the friends of the Tuscola Airport Authority and other petitioners in this matter. The petitioners appeal from two orders. One is dated June the 19th of 2019, found at JA 1-3. The other is November 13, 2019, found at JA 1178 through 1180. I want to focus my time on the salient and significant issues in this case, and that is the fact that this case is governed by Barnstable, the town of Barnstable v. SAA, found at 659 Fed 3rd 28, a DC Circuit decision of 2011. There is no, I repeat, there is no difference in the facts of this case and the facts of this case. Barnstable, Mr. Armstrong, Mr. Armstrong, Barnstable, in Barnstable the court found that the agency had improperly applied its own handbook. Improperly applied its own handbook. Where, what's the comparable problem here? Where is the agency, and remember, we give deference to agencies in interpreting their own rules. So where, or their own regulations or guidance, where in this case has the FAA failed to properly interpret its own rules to the extent we wouldn't defer to it? Thank you, Jay Chateau, for that question. The agency found the subject, this is on page 1 of the record at JA 1, the subject aeronautical studies conclude the proposed structures would exceed the obstruction standards as contained in Code of Federal Regulations 14 CFR Part 77. They, they go on to say, however, the proposed structures were found to result in no substantial adverse effect on present and planned IFR or VFR operations. The problem, Judge, is that if you read section 6-3-3 of the handbook, the trigger, and you know this because you sat on, you sat on Barnstable. If a structure first exceeds the obstruction strength, if a structure first exceeds the obstruction standards of Part 77, or is found to have a physical or electromagnetic radiation effect on the operation of air navigation facilities, then the proposed or existing structure, if not amended, altered, or removed, has an adverse effect if it would, subparagraph B, require a VFR operation to change its regular flight course or altitude. And that's exactly what's going to happen here. So you just said require, you said require, right? I did say require. I did say require. Require? Yes. Well, the, the agency interprets, the FAA here said that hasn't happened here. The agency's wrong, Judge. I don't care what they said. And the reason, and the reason that's the case, the reason that's the, and the reason that's the case, Judge, is because you wrote in Barnstable, or one of the judges wrote in Barnstable, that the VFR aircrafts may be forced to be rerouted or proceed in violation of the FAA's own regulation, 14 CFR 91.119, which requires a 500-foot distance between an aircraft and any structure. Further, the FAA's own weather compressibility study concluded that during instances of inclement weather, VFR aircraft could, could potentially be compressed to a lower altitude to avoid cloud cover, such that they would come in within 500 feet of the turbines in violation of 91.119. And this is the key, Judge. Indeed, Section 6-3-8B, 2 of the handbook says that any structure that would interfere with a significant volume of low-altitude flights by actually excluding or restricting VFR operations in a specific, in a specific area would be a substantial adverse effect and may be considered a hazard to air navigation. And the problem with this case, Judge, is there's no traffic count. They didn't make a finding of substantial adverse effect because they never conducted, conducted a study of aircraft flying over the site like they did in Barnstable. So that's the problem. That's why our case is exactly like that case. We've got a triggering event. The triggering event is the fact that they exceed obstruction standards. You've got one or two choices under 6-3-3. It can be a radar issue or it can be the Part 77, exceeding Part 77 requirements satisfied. And we have a requirement that aircraft alter course to avoid the wind turbines under 91.119. That means you have to do an analysis under 6-3-4 and 6-3-5B. 6-3-4. The type of activity must be considered in reaching a decision on the question of what volume of air knock activity is significant. For example, if one or more air knock operations per day would be affected, this would indicate regular and continuing activity. This is significant volume no matter what the type of operation. There's no traffic count. They didn't count it. In Barnstable, they did, Judge. And here we are at Barnstable at page 35. A study by consulting firm MITRE, M-I-T-E-R-E, commissioned by the FAA charted how many flights flew through a three-dimension zone around the project, the boundaries of which were 500 feet side-to-side and 1,000 feet above the turbines. The study found that over the course of a 90-day period, 425 flights flew through the immediate vicinity of a project site and that 94.1% of these 425 were flying an altitude of 1,000 feet or less. The 425 flights would be, of course, no more than 634 sets in the threshold of significance. They didn't do a traffic count and they should have. What they're saying in their brief, Judge, they're saying on page 15 that we're limited to the airport traffic area, the airport traffic pattern, that is not correct. And the reason that's not correct, if you look in the record, it says on page 664 at 453, 486, or 499 feet AGO, the structures would not have a substantial adverse effect on en-route. I want to emphasize en-route flight operations. Why en-route? Because that's what the statute requires. Under 49 U.S.C. 44718, you have to, yeah, of course, Your Honor. My understanding is that these wind turbines are not the first ones in this area, that they were added, there's already a lot of wind turbines there and these were added to it. Is that correct? I don't dispute that. Okay, so did you establish any evidence in the record that planes are, were not already going around this area because of the existing wind turbines? What evidence is there that these ones would require planes to fly differently than they're not already doing because of the existing wind turbines? Thank you for the question, Judge. There are three affidavits in the record, one by Ricky Smith, a test pilot with 29,000 flight hours, one by Mr. Pouillot, and a third affidavit, and they all say the same thing. These turbines are between three to nine miles north and northwest of the airport and pilots will have to alter their arrival to the airport that will create bottlenecks. There's sworn testimony. In a way that they wouldn't, that they're gonna have to fly differently than they already have to do to get around the other turbines? That's what they said, Judge, it's in the record. Does that make sense? There's already other turbines there, you're gonna have to go higher to begin with. You don't want to hit the old turbines any more than the new turbines. They're located at different geographic areas, Judge. Mm-hmm, and so your evidence that this one, I don't know what on route your theory, your evidence that this was more on route than the other turbines the airport were from? They're immediately north and northwest, that means you can't approach. Where are the other ones? The existing ones. They're certainly not within this area, they're certainly elsewhere. The point is, are they as close, but maybe more east or south or something? I think there's, I think they're substantially farther north, Your Honor. I think they're substantially farther north. Wouldn't that still be on route to the airport? Not necessarily, Your Honor. Well, what does on route mean? Well, on route, you have to think three dimensionally in airplanes, both laterally, vertically, and horizontally, and they're gonna have to alter... No, no, that's not what I'm asking. You said on route, that's the language you emphasized. Now, in theory, if they were taking off from an airport here in Washington DC, every mile, the air mile they fly between Washington DC and Tuscola Airport would be on route to that airport, and so the fact that something's more north wouldn't change the fact that it's on route to that airport. So I'm trying to understand how we know that these turbines are on route to the airport in a way that the existing turbines, they may be a bit more north or not, they're both part of the airport. Clearly, area north and northwest between three to nine miles of the airport will be occupied by these wind turbines. Three to nine miles. That means that the angle by which you can intercept your inbound course is much more acute. You have to go farther south to get to the airport with these turbines. Any other questions? No. Okay. Thank you, Mr. Armstrong. We'll hear from the FAA. Go ahead. May it please the court, I'm Dana Karasman for the United States. The question here under the FAA's order is whether there's a substantial adverse effect on a significant volume of flights. Significant volume of flights, as you know, is a defined number. It's daily, sometimes weekly is enough, and we are just nowhere near that here. In terms of the airport traffic pattern, it is... Before we get to significant volume, can I ask, this clutter, I think there's no dispute that these turbines create clutter on the radar? That's right, Your Honor. Is clutter an electromagnetic effect on the radar? No, I do not believe that clutter qualifies as an electromagnetic effect. It's a physical effect on the radar. Someone who's not schooled in this area, can you explain to me the difference between a physical effect and... So it's just that they pick them up like they are plane and so it reports it onto the radar? That's right. My understanding, I'm also not schooled in this area, but my understanding is that electromagnetic effect is something you might see with a cell phone tower, something that changes the... Frequency. Electromagnetic... Whereas the wind turbines, they pick up because they are physically there, the radar signal is bouncing off. Got it. Okay. Got it. Thank you. So there is clutter, but that clutter would only affect the ability of FAA to provide tracking to these aircraft that don't have transponders, but nonetheless want air traffic control services. And FAA looked at the data and saw in the prior year, there had only been seven of those flights. They can still... Nobody is guaranteed that service, but to the extent resources permit, they can still get that service. Effectively, you did have a flight count for the VFR flights, right? For the... So there's... Individual flight rules, flights, you effectively did have... Counselor said the government didn't have a flight count, he said traffic count, but effectively you did because you had the prior year's data. Is that... Am I correct in that? So that prior year's data shows all of the flights using instrument procedures. There could be flights using visual flight rules procedures that were not... That didn't ask for services from air traffic control, that didn't show up on that spreadsheet, but that spreadsheet... One of the questions was, would there be an effect on this particular instrument procedure? This VOR A is an instrument procedure, and there is an effect there, but again, we're looking at one flight every 22 days. Now, for the instrument flight rules flights, what we care about there, it's important to distinguish between the airplanes that are in the airport traffic pattern airspace, that is a couple of miles before the runway, a couple of miles after, on the sides, so that the airplanes can circle at the airspace. There are no wind turbines in that area. There were proposals for some, Tuscola has a bigger one than its current runway support, because they have this proposal for a runway that would do category C aircraft that's never been built, but if it takes that into account. So there are no aircraft in the airport traffic pattern that's a larger... I'm sorry, did I say there are no aircraft? There are no wind turbines in the airport traffic pattern airspace that's currently being used, or that would be used even with this, if this larger runway were ever built. Then if we talk about planes that are en route, these wind turbines are less than 500 feet tall, which is high, but not compared to cruising altitude for an airplane. Go ahead, finish. I'm sorry, I thought you were done. Go ahead and finish. Oh, I was just gonna say, so that doesn't present a problem within the meaning of the FAA order. These aircraft can still fly over these wind turbines. And then, of course, there's no data in the record. This isn't like Barnstable. There's no data in the record showing that there are actually airplanes flying over that area. The wind turbines in the area, Your Honor, can see at JA600, and it shows a long stretch of wind turbines in that area, and you can see a little red circle around where the new ones are. So we don't know that aircraft are flying over that, but they can still fly over it as long as they're more than 500 feet. The term en route in this context refers to planes that are not landing there, but are flying over and not landing. Is that correct or incorrect? Yeah. So once an aircraft is in landing, sort of in the process of landing, it's in the airport traffic pattern airspace, which is several couple of miles in every direction. What does the term en route refer to? So an aircraft is en route whenever it is not in that airport traffic pattern airspace? It's not in the pattern. It's flying in that area, but not in the pattern, in the landing pattern, right? Okay. Yeah. It could be on its way to Tuscola. It could be on its way someplace else, but the FAA handbook at six stations... Wait, wait, wait. Hold on. If it's on its way to Tuscola, why is it in the landing pattern? You just confused me. I thought your answer to Judge Sintel said that planes that are en route are planes that are passing by. No? Right. So... What do you mean right? Now you've got me completely confused. Yeah. I'm sorry, Your Honor. Right is one of my verbal tics. Once the airplane is coming in for a landing, it's in that airport traffic pattern airspace. So it has ceased to be en route at that time? Is that... Exactly. So at the order at 6-3-8, anything that is not in the airport traffic pattern airspace is en route. Okay. And with the regulations about... A plane could be en route for a while and then cease to be en route when it gets in the pattern. Is that correct? Exactly. But there's no effect on that pattern because there are no wind turbines in the airport traffic pattern airspace. Okay. So any effect on any traffic pattern on any flight... Could you... Could be on flights that were en route. So if there's not any effect on en route flights, then there's not an effect. Exactly, Your Honor. And this point about something that is less than 499 feet isn't in Tuscola going to have an effect on the en route airspace because of the flight, the altitude at which airplanes can fly over that. There was... I'm sorry. I'm confused by that answer. Why isn't requiring a change in altitude, that is, ensure you're 500 feet over these wind turbines, a change in altitude or route before they get to the... So we're seeing landing or landing. That group. It seems like you are changing the route. They're gonna have to go 500 feet above or go further around. So there's... There are a couple of answers there. One piece is that we don't have any data that aircraft are actually flying over these wind... At this place where these wind turbines would be in their regular course of flight. In their regular course, right? What we're looking at here is whether there is a significant volume for visual flight rules that would be daily flights... What is the significance requirement which isn't part of 638? Or I'm sorry, not 638 program, but the 633B require a VFR operation to change its regular flight course or altitude. Yes, that's right. So 633 looks at whether there's an adverse effect and then 634... Okay. 634 says that adverse effect has to be substantial. And that means significant volume. And 634 tells us what a significant volume is. And then 638 requires significant volume as well. And so what you're saying is there's... Well, there's no evidence in the record one way or the other. And these things, as he points, as Mr. Armstrong points out are three miles away from the airport. Shouldn't the FAA have checked to see whether... What airplanes... What volume of airplanes in that area that close to the airport are gonna be now required to fly higher than they might like if they're coming in for... Coming in to land at this airport? The argument that the FAA should have checked this particular flight path is something that I have heard for the first time today at argument. The agency did look at... I understood that from their briefing here, so I'm not sure whether I've just misunderstood something, but they definitely raised... 638, the people are gonna have to fly higher or go out of the way to go around these windmills. They definitely raised that in their brief. I'm not smart enough to think that myself. And so I don't know how we know that there's not a significant volume of planes that now have to either go higher or go around. Didn't you say earlier... I understood you to say earlier in response to Judge Willett that the FAA doesn't have any information about planes flying those routes. Isn't that what you said? Yes, Your Honor. I interpreted that as saying... I interpreted that as saying there aren't any flights. There aren't any airplanes flying there. Is that what you said? I don't know. So we don't have... To the best of my knowledge, we don't have data on how high planes are flying right there, which as has been observed is very close to a whole bunch of other wind turbines. We don't have data on how many planes are flying right there at all or below 1000 feet, which would be the only planes that would have to move up. But if you look at the way these regulations... Can I back up? As Judge Tatel said, when you say we don't have data, does that mean we looked and there's zero? Or does that mean we didn't check? I am not aware that FAA looked at the... There's nothing in the record showing that FAA looked at flights... There could be lots of planes flying right there and having to go 500 feet over these turbines. We just don't know one way or the other. Yeah, of course, as Your Honor pointed out, and you can see the J600, there are a lot of wind turbines right here in this area. This is right next to... Should the FAA have checked to find out if there's planes flying lower than 1000 feet over that area? I understood your early answer to mean that there weren't planes doing that. Now I'm understanding you to be saying we don't know whether there are planes doing that. I do not know what data FAA has on this. The idea that FAA had an obligation to look at this particular data set, I do think is new today at argument, but I wanna take a step back and just talk about why it doesn't matter here. Because the handbook at 638C that talks about unroute flights talks about obstructions that are less than 499 feet. All of these wind turbines are less than 499 feet. When you're taking off from Tuscola, you have to have... With the visual flight rules flight, you have to be able to fly over 1000 feet, which is how these things come together in 683C, where you should be able to fly right over these. You should be able to fly high enough to go over these with your visual flight rules flight, if it's clear enough for you to take off from Tuscola. So the handbook, the FAA's guidance here... I'm sorry, I'm still confused. They should be able to, there's no question that they should be able to do it. The question is whether, but for these wind turbines, is it necessary to be able to fly over 1000 feet and then have a visual flight pattern? And then if it does, then we need to know whether there's a significant volume there. And that's what you told me we don't know. So Your Honor, the height over the wind turbine, a plane taking off from Tuscola based on the visibility rules, what I meant by should, they can fly over these wind turbines at 500 feet. And that's where that number of 499 feet, which is the point at which FAA starts looking more carefully at a structure, that comes from the intersection of these visibility rules, which apply when you take off into Tuscola, and the... For visual flight rules flights, and the height of the wind turbine. So we have this framework that already takes into account when a change in elevation is going to be an issue. But we don't even know, as you see, these wind turbines are close to many other wind turbines. So if this were 501 feet, then you would have to have a, have to acquire the data as to how many planes were flying over there. Is that, is that correct? I'm not sure exactly what obligations are triggered once you get to 501 feet or even 500 feet, because they're not triggered in this case, right? There is nothing here at this, there's nothing here that is going to be over 499 feet. So it's not triggered here. It doesn't, airplanes can still fly over these wind turbines. They're flying 500 feet up. That's just the, the regular rule that you have to fly. Same thing if you build a house or... Are you saying that the requirements that council was relying on, and saying the FAA had violated, do not apply because of these structures are less than 499? Is that what you were saying? I missed the beginning of your honest question. My sound went out. Council was saying the FAA had violated its own regulations. So what I understand you to be saying is the requirement upon which he's relying does not apply here because the structures are less than 499 feet. Is that what you are saying? Yeah, I'm not totally sure what, what he thinks that we violated, but because these are less than 499 feet, they're not going to present a problem for en route flights under the FAA's guidance sets this, sets this all out. I'm sorry, I'm still confused. Do you have a question, Dan? No, you can change the subject. I'm sorry. Either of the Danis. I'm going to change the subject. You, if you have a question related to this, go ahead. I do. 638B, B1B says flight over sparsely populated areas, which I guess this would probably be. An aircraft might not be operated closer than 500 feet to any structure for our purposes, vessel vehicle structure. Cannot be, I don't get why it matters how tall this is. They can't be within 500 feet of a structure and a just three miles north of the airport. And so isn't that necessarily going to make anyone who's in that area where there didn't used to be structures have to fly at a different altitude to be 500 feet above those structures? So we don't know that there was anybody flying. That's the question, right? That's, that's the data question that we don't have here. I'm just asking about whether they're required to be 500 feet above. And before the turbines, before the turbines were there, they weren't required to be 500 feet on top of whatever the turbine feet is. They could have been lowered to the ground in this very spot. I want to be careful here because you know, a thousand feet is a pretty typical minimum cruising altitude. But it depends on the kind of aircraft. You're not your usual cruising altitude if you're three miles away from the airport. This is reflected by the airport traffic pattern airspace, right? FAA sets up the airport traffic pattern airspace for when, that's when something stops being en route and starts being in landing. So I don't know how far three feet is, sorry, three miles is for an airport late, for an airplane coming into land. But the FAA's airport traffic pattern airspace tells us when something stops being en route, when something stops being you know, things start to be a concern. I understand that explanation but I don't, I'm just talking about a handbook here that says if there's a change to altitude that's an adverse effect. And one thing that is a change in altitude is that you got to be 500 feet over any structure. So when new structures are put up where there was say nothing before but a field, you're going to have to change where you're flying. Because now you got to be 500 feet on top of however tall that structure is, which you wouldn't have had to do before. And so to know we've got an adverse effect and to know whether it's significant, I think we need to know how many planes are having to do this. And that's what you say we don't have the data for. That's my confusion. So when we're looking at 633 sets the sort of threshold for adverse effect. But then when we're looking at whether there's a substantial adverse effect and we're looking at this particular question, we go to 638. And 638C governs en route flights and it says that things under 499 feet don't trigger that. Now petitioners have put, as I say, declarations into the record. They have put information into the record and what they have not put into the record is that people are actually flying over this area. They haven't submitted any evidence from anybody using this airport saying I normally fly here where these wind turbines are going to be built at less than a thousand feet high. I do it every day, right? Because that's what we're looking at. Not just the occasional weekend flight but you know. Ann says if its height is greater than 499 feet and it's within two statute miles. So if it's in within, I don't even know what a two statute mile is of any regularly used VFR route. So these turbines are not 499 feet? No they're all under 499 feet. Okay. Could you just very quickly respond to Mr. Armstrong's argument when he stood up that this case is completely controlled by Barnstable? Sure your honor. In Barnstable there were three airports in this area. It was a fairly congested area and there was data showing multiple flights every day going in this area that they would not, if it's flying actually at the elevation, they would no longer be able to use. It was over water. Planes often fly lower over water and the court didn't, the court you know remanded because the agency hadn't considered that data. So we don't have data like this and the data they put in the record, the information they put in the record, they don't have anybody saying that this is part of their regular flight path that they know of a plane that flies over this area every day. We just don't have anything. All right thank you. Okay. Judge Millett, Judge Centello, any other questions? Nothing further. Okay. Thank you. Mr. Armstrong you can have one minute. The position the agency advancing in this case is the exact same position rejected in Barnstable. This is a reading from Barnstable 2. In Barnstable 1, 659 Fed 3rd at 3435, this court held that the FAA had misread its regulations by relying solely on 6-3-8c1. That's exactly what she's relying upon in this case, Judge. Other handbook defined no adverse effect on VFR operations because the turbines would not exceed 500 feet. The FAA had not addressed whether the turbines would have an adverse effect under 633, it at 35. Section 633 states that, quote, a structure is considered to have an adverse effect if it first is found to have a physical or electromagnetic radiation effect on the operation of navigation facilities. If so, then an adverse effect is relevant and exists where a structure would require a change in IFR flight altitude or VFR operation flight course or altitude or affect future VFR or IFR operations. Handbook at section 633 A, B, C, D, E. The court found no apparent analysis. No apparent, that's exactly what's happened here. It's exactly the same thing. Okay. It's the same thing. Thank you. Sorry. So, Dave, did you have a question? Yeah, where is the best place in your brief to read about what you, this argument? Pages 6, 7, 8 of my reply brief. It came up first in the reply brief. Yeah, my reply brief is a better discussion of this than in my primary brief. Pages 6, 7, and 8. I discussed this. This is not the first time I've raised this. I referenced 633, 634, and 635B in my reply brief. Is it in your opening brief at all? Yes, not to the extent of my reply brief. I referenced 63B1 in my opening brief. 63B1. Okay. Thank you. That's all. Okay. Well, thank you. The case is submitted.
judges: Tatel, Millett, Sentelle